(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GALETTE *v*. NEW JERSEY TRANSIT CORPORATION

### CERTIORARI TO THE SUPREME COURT OF PENNSYLVANIA, EASTERN DISTRICT

No. 24–1021. Argued January 14, 2026—Decided March 4, 2026*

In 1979, the New Jersey Legislature created the New Jersey Transit Corporation (NJ Transit) as a "body corporate and politic with corporate succession" and constituted it as an "instrumentality of the State exercising public and essential governmental functions" but "independent of any supervision or control" by the New Jersey Department of Transportation. N. J. Stat. §27:25–4(a). The State gave NJ Transit significant authority, including the power to make bylaws, sue and be sued, make contracts, acquire property, raise funds, own corporate entities, adopt regulations, and exercise eminent domain powers. §§27:25–5, 27:25–13. NJ Transit's organic statute provides that "[n]o debt or liability of the corporation shall . . . constitute a debt [or] liability of the State," and that "[a]ll expenses . . . shall be payable from funds available to the corporation." §27:25–17. NJ Transit is governed by a board of directors (Board). §27:25–4(b). The Governor may remove Board members and may veto Board actions; the Legislature may veto some eminent domain actions. §§27:25–4(b), (f); §27:25–13(h). NJ Transit is now the third largest provider of bus, rail, and light rail transit, operating within an area that includes New Jersey, New York City, and Philadelphia.

In 2017, Jeffrey Colt was struck by an NJ Transit bus in Midtown Manhattan; a year later, Cedric Galette was injured when an NJ Transit bus crashed into a car in which he was a passenger in Philadelphia. Both sued NJ Transit for negligence in their respective home state courts. NJ Transit moved to dismiss both lawsuits, arguing that it is an arm of New Jersey entitled to sovereign immunity. The New

---

*Together with No. 24–1113, *New Jersey Transit Corporation et al.* v. *Colt et al.*, on certiorari to the Court of Appeals of New York.

York Court of Appeals held that NJ Transit is not an arm of New Jersey; the Pennsylvania Supreme Court held the opposite, concluding NJ Transit is an arm of New Jersey. This Court consolidated the cases and granted certiorari to resolve the conflict.

*Held*: NJ Transit Corporation is not an arm of New Jersey and thus is not entitled to share in New Jersey's interstate sovereign immunity. Pp. 5–23.

   (a) Sovereign immunity is "'personal'" to the State and extends only to arms of the State itself, *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 675, not to legally independent entities that the State creates. Whether an entity is "an arm of the State . . . is a question of federal law" answered by considering the "provisions of state law that define the agency's character." *Regents of Univ. of Cal.* v. *Doe*, 519 U. S. 425, 429, n. 5. Pp. 5–10.

      (1) The Court's early cases focused on whether an entity was a separate legal person from the State, with the corporate form serving as a key marker of separate legal personhood. A "corporation" was understood as "an artificial person" that could "sue and be sued by its own members" and "contract with them . . . as with any strangers." *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 667–668. In *Bank of United States* v. *Planters' Bank of Ga.*, 9 Wheat. 904, the Court held that a state-chartered bank was not an arm of Georgia because it was a "corporation" and judgments would be satisfied by the corporation's property, not the State's. Subsequent cases reaffirmed this holding even when the State exerted significant control over the bank. See, *e.g.*, *Bank of Kentucky* v. *Wister*, 2 Pet. 318, 323–324. The Court also applied the same reasoning to cities and counties created as municipal corporations. See *Lincoln County* v. *Luning*, 133 U. S. 529, 530–530. Pp. 6–7.

      (2) Beginning in the mid-20th century, the Court began taking a more holistic view of an entity's relationship with the State, but remained focused on whether the State structured the entity to be legally separate, with corporate status remaining central. In *Moor* v. *County of Alameda*, 411 U. S. 693, 719–721, the Court held that a county was not an arm of the State because it was created as a "body corporate and politic" with "'corporate powers'" and the county alone would be "liable for all judgments against it." In *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280, the Court framed the inquiry as asking whether an entity is "more like a county or city" than "like an arm of the State," and concluded a local school board was not an arm of the State. In *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, and *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, the Court found that two bistate entities were not arms of the State where they were created as separate legal

entities, judgments against the entities were not binding on the States, and the entities generated their own revenues and paid their own debts. Pp. 8–10.

(b) The Court's precedents have consistently and predominantly examined whether the State structured the entity as a legally separate entity liable for its own judgments. The clearest evidence of legal separateness is when the State created a corporation with traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt. A State might create a corporation precisely because of its independent legal status, allowing the State to distance itself from burdens the corporate entity may incur. When a State makes such a decision, courts should presume the corporation enjoys all the advantages and disadvantages of separate legal status, including that it is no longer part of the State itself. Other aspects of state law may also indicate legal separateness, such as defining the entity as a "separate legal entity" or excluding it from the definition of "State" for other purposes.

The Court's precedents also focus on whether the entity is liable for its own judgments or whether the State is formally liable. One central rationale for sovereign immunity is protecting States' "ability to make [their] own decisions about 'the allocation of scarce resources.'" *Lewis* v. *Clarke*, 581 U. S. 155, 167. If the State is formally liable for judgments against an entity, that entity is more likely an arm of the State. An entity's practical financial relationship with the State, such as an expectation that the State would cover its judgments if needed, or the State's history of subsidizing the entity, has less relevance.

Finally, courts may consider the degree of control the State exerts over the entity, but should do so with caution because "ultimate control of every state-created entity resides with the State," even those that are not arms of the State. *Hess*, 513 U. S., at 47. "Gauging actual control" can be a "'perilous'" and "'unreliable'" inquiry. *Ibid.* The Court has never found a corporation liable for its own judgments to be an arm of the State, even when the State had significant control, including cases where the State was sole shareholder, possessed appointment and removal powers, and managed the entity's affairs. See *Wister*, 2 Pet., at 323–324. Pp. 10–13.

(c) Even if an entity is not an arm of the State, a particular suit or remedy may require dismissal due to sovereign immunity if the State is nevertheless the real party in interest. See, *e.g.*, *Hopkins* v. *Clemson*, 221 U. S. 636. Because NJ Transit never argued that New Jersey is the real party in interest in either of these cases, dismissal on this ground is not implicated here. Pp. 13–15.

(d) Applying these principles, NJ Transit is not an arm of New Jersey. To start, New Jersey structured NJ Transit as a legally separate

entity: It was created as a "body corporate and politic with corporate succession" possessing typical corporate powers, such as the power to "[s]ue and be sued," "enter into contracts," and "acquire . . . property." §§27:25–4(a), 27:25–5(a), (j), (r). NJ Transit's corporate status serves as strong evidence it is not an arm of the State. Although NJ Transit's organic statute labels it an "instrumentality of the State," §27:25–4(a), that term lacks the historical weight of the corporate form and says little about arm-of-the-State status. Other aspects of New Jersey law undercut any inference from the term "instrumentality": The New Jersey Tort Claims Act and Contractual Liability Act exclude entities with sue-and-be-sued authority from the definition of "State." §§59:1, 59:3, 59:13–2.

Second, as NJ Transit concedes, the State is not formally liable for any of NJ Transit's debts or liabilities under New Jersey law. §27:25–17.

Finally, the control New Jersey exerts over NJ Transit does not change the conclusion. Although the State exerts substantial control— *e.g.,* Governor's appointment and removal powers, §27:25–4(b); cabinet member chairing the Board, §27:25–4(d); gubernatorial veto power, §27:25–4(f); legislative veto over some eminent domain actions, §27:25–13(h)—New Jersey law also states NJ Transit "shall be independent of any supervision or control by the [transportation] department" and requires it to "exercise independent judgment." §§27:25–4(a), 27:25–4.1(b)(2)(d). This level of control does not meaningfully affect NJ Transit's status with respect to the arm-of-the-State analysis given that it is a legally separate corporation responsible for its own judgments. Pp. 15–17.

(e) NJ Transit's and its *amici*'s counterarguments are unavailing. NJ Transit contends corporate status is not dispositive, but NJ Transit is a corporation with all the hallmarks of separate legal personhood, and the Court has not previously found a similarly structured corporation to be an arm of the State. NJ Transit's reliance on *State Highway Comm'n of Wyo.* v. *Utah Constr. Co.*, 278 U. S. 194, is misplaced because that case concerned whether the State was the real party in interest in a particular contract dispute, not whether the entity was in the abstract an arm of the State.

NJ Transit argues its description as serving "public and essential governmental functions," §27:25–4(a), and its delegation of substantial public powers demonstrate an intent by New Jersey to create it as an arm of the State. The arm-of-the-State analysis, however, focuses not on whether the entity serves public functions but on whether the State chose to serve those functions through its own apparatus or through a legally separate entity. Cities and counties serve public functions and exercise police powers but are not arms of the State. Assessing what qualifies as an essential governmental function can also be "unsound

Syllabus

in principle and unworkable in practice." *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 546.

NJ Transit also contends that the Court should consider its practical financial relationship with the State, including the degree of state funding and the likelihood the State would pay its judgments. Neither *Lake Country* nor *Hess* supports this position: *Lake Country*'s discussion of practical consequences relied on real-party-in-interest cases, while its arm-of-the-State analysis discussed only whether the Compact expressly provided that obligations would not bind the States. 440 U. S., at 402. *Hess* focused on whether the Compact or state laws required the States to bear judgments, concentrating on formal liability rather than the entity's practical financial relationship with the State. 513 U. S., at 46. Hinging arm-of-the-State status to practical realities of state funding also risks arbitrary distinctions and inconsistent treatment, as illustrated by New Jersey's funding of NJ Transit's operating budget oscillating from 15% to 46% over 35 years.

Finally, NJ Transit points to cases outside the sovereign immunity context to argue that the Court should place more weight on the State's control over, and practical financial relationship with, the entity. Those cases, however, warned that an entity can count as part of the State for some but not other purposes, and thus have little bearing on the arm-of-the-State analysis.

*Amici* States urge the Court to adopt a rule that a State's own characterization of an entity should be dispositive. This position focuses on the label the State places on an entity, rather than on whether the State structured the entity as legally separate. It also prioritizes one characterization ("instrumentality") over another ("body corporate"), and there is no good reason to believe the State intended NJ Transit to be part of the State itself by using "instrumentality" when it simultaneously used "body corporate," a term traditionally understood to create a "[s]eparate legal personality," *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 625. The States' preferred test does not promote predictability because it still requires courts to decide which state-law pronouncement is dispositive. Consistency is promoted by adhering to the long line of cases finding state-created corporations formally liable for their own judgments not to be arms of the States that created them. States maintain the power to structure themselves as they wish and are free to amend their laws if they intend corporate entities to remain part of the State and for the State to assume their liabilities. Pp. 17–23.

No. 24–1021, 332 A. 3d 776, reversed; No. 24–1113, 43 N. Y. 3d 463, 264 N. E. 3d 774, affirmed; and both cases remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 24–1021 and 24–1113

————

### CEDRIC GALETTE, PETITIONER
24–1021　　　　　　　　*v.*
### NEW JERSEY TRANSIT CORPORATION

*ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
PENNSYLVANIA, EASTERN DISTRICT*

### NEW JERSEY TRANSIT CORPORATION, ET AL.,
### PETITIONERS
24–1113　　　　　　　　*v.*
### JEFFREY COLT, ET AL.

*ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
NEW YORK*

[March 4, 2026]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

States are generally entitled to immunity from being sued in another State's courts without their consent. That sovereign immunity is personal to the State and thus extends only to arms of the State itself, not to legally independent entities that the State creates.

This pair of cases arises out of two accidents, one in New York City and one in Philadelphia, in which New Jersey Transit buses struck and injured people. Both victims sued New Jersey Transit, a corporation created by the New Jersey Legislature, in their respective home courts in New York and Pennsylvania. The highest courts in those States diverged as to whether New Jersey Transit is an arm of

New Jersey.   The Court granted certiorari to resolve whether New Jersey Transit is an arm of New Jersey and thus entitled to the State's sovereign immunity.  It is not. Accordingly, the judgment of the New York Court of Appeals is affirmed and the judgment of the Pennsylvania Supreme Court is reversed.

## I
## A

Starting in the 1960s and 1970s, New Jerseyans increasingly drove to work.  This shift led railroads to curtail commuter-rail services connecting the New Jersey suburbs to New York City and caused significant highway congestion. The New Jersey Legislature responded by providing heavy subsidies and operational assistance to the major private rail and bus companies that served the region, but service remained severely fragmented.

In search of a new solution, the Legislature in 1979 created the New Jersey Transit Corporation (NJ Transit).  See N. J. Public Transportation Act of 1979, N. J. Stat. §27:25–1 *et seq*. (2026).  The State structured the entity as a "body corporate and politic with corporate succession."  §27:25–4(a).  The "corporation" was "constituted as an instrumentality of the State exercising public and essential governmental functions."  *Ibid*.  It was "allocated within the Department of Transportation," but "the corporation" was "independent of any supervision or control by the department or by any body or officer thereof."  *Ibid*.

The State gave NJ Transit significant authority.  For instance, it has the power to: make its own bylaws; sue and be sued; enter into contracts; acquire or deal in and with real or personal property; raise funds from fares, gifts, grants, or loans; own and control any corporate entity acquired or formed to carry out its objectives; adopt rules and regulations as necessary; and exercise eminent domain powers.   §§27:25–5, 27:25–13.   Moreover, NJ Transit's

organic statute provides that "[n]o debt or liability of the corporation shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State." §27:25–17. It also states that "[a]ll expenses incurred by the corporation . . . shall be payable from funds available to the corporation" and that "no liability or obligation shall be incurred by the corporation beyond the extent to which moneys are available." *Ibid.*

The corporation is governed by a board of directors (Board). §27:25–4(b). The Board has 13 members, 11 of whom are voting members. *Ibid.* The voting members consist of three ex officio members from the Governor's cabinet, six members appointed with the advice and consent of the Senate, and two members appointed on the recommendation of the President of the Senate and Speaker of the General Assembly. *Ibid.* The Governor may remove any Board member (eight of whom only for cause) and may veto any action the Board takes. §§27:25–4(b), (f). The Legislature may also veto some eminent domain actions. §27:25–13(h).

Once created, the Board adopted its own bylaws and hired a President and CEO to manage day-to-day operations. It then acquired and consolidated the assets of several major rail and bus services operating in and around New Jersey. In the last several decades, the Legislature has appropriated funding for NJ Transit's operational budget each year, covering anywhere from 15% to 46% of that budget. Brief for NJ Transit 35. NJ Transit also receives funding from the State and the Federal Government for its capital projects.[1] NJ Transit's revenues have fluctuated over time; in 2024, it generated $832 million in operating revenues.[2]

---

[1] See NJ Transit Corp., New Jersey Transit Corporation Annual Financial Report (Year Ended June 30, 2024), p. 11, https://perma.cc/Z2H5-ZJ48.

[2] *Id.*, at 4.

Today, NJ Transit is the Nation's third largest provider of bus, rail, and light rail transit, operating within a 5,300-square-mile area that includes New Jersey, New York City, and Philadelphia.

B

In 2017, Jeffrey Colt was crossing 40th Street in Midtown Manhattan when an NJ Transit bus struck him and knocked him to the ground. A year later, Cedric Galette was a passenger in a car driving down Market Street in Philadelphia when an NJ Transit bus crashed into the car. Both were seriously injured.

Colt and Galette sued NJ Transit for negligence in their respective home state courts: Colt in New York and Galette in Pennsylvania. NJ Transit moved to dismiss both lawsuits, arguing that it is an arm of New Jersey and thus entitled to New Jersey's sovereign immunity.

The New York Court of Appeals held that NJ Transit is not an arm of New Jersey. 43 N. Y. 3d 463, 466, 264 N. E. 3d 774, 776 (2024). The court first observed that the Federal Courts of Appeals have analyzed whether an entity is an arm of the State using "an array of multifactor and multistep tests." *Id.*, at 472, 264 N. E. 3d, at 780.[3] It then distilled from those cases a three-factor inquiry: "(1) how the State defines the entity and its functions, (2) the State's power to direct the entity's conduct, and (3) the effect on the State of a judgment against the entity." *Id.*, at 473, 264 N. E. 3d, at 781. Applying those factors, the court held that

———————

[3] See, *e.g.*, *Fresenius Medical Care Cardiovascular Resources, Inc.* v. *Puerto Rico and Caribbean Cardiovascular Center Corp.*, 322 F. 3d 56, 68 (CA1 2003); *Mancuso* v. *New York State Thruway Auth.*, 86 F. 3d 289, 293 (CA2 1996); *Karns* v. *Shanahan*, 879 F. 3d 504, 513 (CA3 2018); *Springboards to Education, Inc.* v. *McAllen Independent School Dist.*, 62 F. 4th 174, 178–179 (CA5 2023); *Kohn* v. *State Bar of Cal.*, 87 F. 4th 1021, 1027–1030 (CA9 2023) (en banc); *Puerto Rico Ports Auth.* v. *Federal Maritime Comm'n*, 531 F. 3d 868, 874 (CADC 2008) (Kavanaugh, J.).

NJ Transit is not an arm of New Jersey and that Colt's suit could thus proceed.

The Pennsylvania Supreme Court, however, held the opposite, concluding that NJ Transit is an arm of New Jersey. 332 A. 3d 776, 779 (2025). It applied its own six-factor test, which considers: "'(1) the legal classification and description of the entity within the governmental structure of the State, both statutorily and under its caselaw; (2) the degree of control the State exercises over the entity, both through the power of appointment, and the power to subsequently veto its actions; (3) the power of the entity's board to independently raise revenue on its own; (4) the degree of funding provided by the State to the entity relative to other funding sources; (5) whether any monetary obligation incurred by the entity is binding upon the State; and (6) whether the core function of the entity . . . can be categorized as a function which is normally performed by local government or State government.'" *Id.*, at 785–786 (brackets omitted). Under that test, the Pennsylvania Supreme Court concluded that NJ Transit is an arm of New Jersey and thus dismissed Galette's suit.

This Court granted certiorari to resolve the conflict and consolidated the cases. 606 U. S. 959 (2025).[4]

## II

A State's immunity from suit is a "fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden* v. *Maine*, 527 U. S. 706, 713 (1999). State sovereign immunity bars private parties from suing a nonconsenting State in that State's own courts or in the courts of another State. See *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. 230,

---

[4] After this Court granted certiorari, NJ Transit filed an application for stay of Colt's pending damages trial in the Supreme Court of the State of New York. This Court stayed the trial pending issuance of the mandate in these cases. 606 U. S. 1051 (2025).

249 (2019). In so doing, it prevents "the indignity of sub-jecting a State to the coercive process of judicial tribunals at the instance of private parties." *In re Ayers*, 123 U. S. 443, 505 (1887). It also protects the State from "being thrust . . . against its will, into the disfavored status of a debtor, subject to the power of private citizens to levy on its treasury." *Alden*, 527 U. S., at 749.

Sovereign immunity, however, is "'personal'" to the State itself. *College Savings Bank* v. *Florida Prepaid Postsecond-ary Ed. Expense Bd.*, 527 U. S. 666, 675 (1999). It does not extend to "lesser entities," such as "municipal corpora-tion[s] or other governmental entit[ies]" that are not "arm[s] of the State." *Alden*, 527 U. S., at 756. Whether an entity is "an arm of the State . . . is a question of federal law" that "can be answered only after considering the pro-visions of state law that define the agency's character." *Re-gents of Univ. of Cal.* v. *Doe*, 519 U. S. 425, 429, n. 5 (1997). Before addressing whether NJ Transit is an arm of New Jersey, the Court first sets forth the principles that have guided the arm-of-the-State inquiry in its precedents.

### A

#### 1

When examining the relationship between the State and an entity it created, this Court's early cases focused on whether the entity was a separate legal person from the State. One key marker of separate legal personhood was the corporate form. At common law, a "corporation" was "an artificial person, existing in contemplation of law, and endowed with" "certain immunities, privileges, and capaci-ties in its collective character, which do not belong to the natural persons composing it." *Trustees of Dartmouth Col-lege* v. *Woodward*, 4 Wheat. 518, 667 (1819). As a result of its separate legal personhood, a corporation could "sue and be sued by its own members" and "contract with them in the same manner as with any strangers." *Id.*, at 667–668.

This Court first applied this idea of corporate personhood to the arm-of-the-State inquiry in *Bank of United States* v. *Planters' Bank of Ga.*, 9 Wheat. 904 (1824). It held that a state-chartered bank was not an arm of Georgia because it was a "corporation" and "the judgment" would "be satisfied by the property of the corporation, not by that of the individual corporators." *Id.*, at 907. Chief Justice Marshall explained that the "State of Georgia, by giving to the Bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the Bank, and waives all the privileges of that character." *Id.*, at 907–908. Subsequent cases reaffirmed *Planters' Bank*'s holding, relying on the corporate status of other state-chartered banks to deny them sovereign immunity. That was true even when the State exerted significant control over the bank, such as by being its sole shareholder or possessing appointment and removal power over its officers. See, *e.g.*, *Bank of Kentucky* v. *Wister*, 2 Pet. 318, 323–324 (1829); *Briscoe* v. *Bank of Kentucky*, 11 Pet. 257, 326–327 (1837); *Curran* v. *Arkansas*, 15 How. 304, 309 (1853).

The Court applied the same reasoning to cities and counties that were created as municipal corporations. The Court explained that the corporate form of such entities, which included the power to "sue and be sued," likewise made them legal persons separate from the sovereign and thus not entitled to share in the State's sovereign immunity. See *Lincoln County* v. *Luning*, 133 U. S. 529, 530–531 (1890).

Employing similar logic, the Court also held that entities created by the Federal Government were not its "arms" when they possessed the separate personhood of a corporation. See, *e.g.*, *Metropolitan R. Co.* v. *District of Columbia*, 132 U. S. 1, 7–8 (1889); *Sloan Shipyards Corp.* v. *United States Shipping Bd. Emergency Fleet Corporation*, 258 U. S. 549, 566–568 (1922); *Federal Land Bank of St. Louis* v. *Priddy*, 295 U. S. 229, 235–237 (1935); *Keifer & Keifer* v.

*Reconstruction Finance Corporation*, 306 U. S. 381, 393–394 (1939).

2

Beginning in the mid-20th century, the Court began to consider additional features of an entity's relationship with the State in the arm-of-the-State inquiry. Even so, the analysis remained focused on discerning whether the State had structured the entity to be legally separate, and corporate status remained central to that analysis.

For example, in *Moor* v. *County of Alameda*, 411 U. S. 693 (1973), the Court addressed whether a county was an arm of the State, and therefore not a "citizen," for purposes of diversity jurisdiction. *Id.*, at 717–718 (explaining that a State is not a "citizen" for diversity purposes). The county at issue argued that its designation, by the California Constitution, as a "'legal subdivisio[n] of the State'" established its status as an arm of the State. *Id.*, at 718–719. The Court, however, disagreed. It explained that the county was also created as a "'body corporate and politic,'" which meant, "[m]ost notably," that the county was given "'corporate powers,'" such as the ability to "sue and be sued," to "deal in property," and to make "contract[s]." *Id.*, at 719. Financially, moreover, the county alone would be "liable for all judgments against it" and could issue bonds without creating an "obligation on the part of the State." *Id.*, at 719–720. Finally, the Court observed that, given the county's corporate status, the California Supreme Court had held that counties could be sued by the State. *Id.*, at 720–721. The Court thus concluded that the county was not an arm of the State because the county had a "sufficiently independent corporate character." *Id.*, at 721.

Resting on the firmly established rule that municipal corporations and counties are not arms of the State, the Court in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274 (1977), framed the arm-of-the-State inquiry as asking whether an

entity is "more like a county or city" than "like an arm of the State." *Id.*, at 280. In answering that question for the entity at issue, a local school board, the Court examined the characteristics of the board under state law. It observed that the board was created as a "'political subdivisio[n]'" distinct from the "'State,'" that it had powers to issue bonds and levy taxes, and that it received money and guidance from the State. *Ibid.* Those characteristics led the Court to conclude that the board was "more like a county or city" and thus not entitled to immunity. *Id.*, at 280–281.

The Court again asked whether an entity was "comparable to a county or municipality" or rather an arm of the State in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 401 (1979). There, the entity at issue was the Tahoe Regional Planning Agency, a bistate entity created by California and Nevada alongside the Federal Government under the Compact Clause. *Id.*, at 394. The Court explained that the interstate compact created the agency as a "'separate legal entity'" and a "'political subdivision'" and that judgments against the agency were not binding on either State. *Id.*, at 401–402. The Court also observed that most of the agency's governing members were not appointed by the States; that its rulemaking authority was not subject to any state-level veto; that the agency's function (land-use regulation) was a traditional local government function; and that California had previously sued it. *Ibid.* The agency, the Court concluded, was therefore not an arm of either State. *Id.*, at 402.

Finally, in *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30 (1994), the Court again found that a bistate entity created under the Compact Clause was not an arm of the State. It explained that the Authority was described in the compact and state laws as a "'joint or common agency,'" a "'body corporate and politic,'" and a "'municipal corporate instrumentality'" of New York and New Jersey. *Id.*, at 44–45. Financially, the States were not liable for the

Authority's debts or judgments; the Authority was barred from pledging the credit of either State or from borrowing money in any name but its own; and the entity generated its own revenue. *Id.*, at 46. The Court acknowledged that the States exerted significant control over the Authority— they had appointment and removal power over the commissioners, the Governors could veto the Authority's actions, and the States' legislatures could determine what projects the Authority would pursue—but rejected control as a "dispositive" factor in its overall analysis. *Id.*, at 47–48. In the end, after considering the above facts and the underlying purposes of sovereign immunity, the Court concluded that the Authority's status as a "discrete entity" that "generates its own revenues" and "pays its own debts" ultimately rendered it not an arm of the State. *Id.*, at 52.

B

Although the Court's arm-of-the-State cases have accounted for various considerations over time, those precedents have consistently, and predominantly, examined whether the State structured the entity as a legally separate entity liable for its own judgments.

The clearest evidence that a State has created a legally separate entity is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt. See *Planters' Bank*, 9 Wheat., at 907–908; *Lincoln County*, 133 U. S., at 530–531; *Hess*, 513 U. S., at 44–45. The corporate form is particularly salient because it has "long [been] settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations." *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 591 U. S. 430, 435 (2020). Indeed, "[s]eparate legal personality has been described as 'an almost indispensable aspect of the public corporation.'"

*First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba*, 462 U. S. 611, 625 (1983).

In fact, a State might choose to create a corporation, rather than an unincorporated government agency, precisely because of its independent legal status. This move allows the State to distance the entity from burdens that apply to the State itself or to distance the State from the burdens that the corporate entity may incur. For instance, States initially created banks as corporations in part because States themselves are not permitted to "emit Bills of Credit" under the Constitution. Art. I, §10; see *Briscoe*, 36 U. S., at 326–327. States have also created corporations to circumvent state constitutional debt limitations placed on state agencies. See, *e.g.*, *Schulz* v. *State*, 84 N. Y. 2d 231, 243–244, 639 N. E. 2d 1140, 1145–1146 (1994). When it comes to facilitating certain projects, such as high-risk, long-term capital investments, States may establish corporations in order to shield themselves from the responsibility and, more importantly, the liability that the corporation's projects may incur. When a State makes such a decision, courts should presume that the corporation enjoys all the advantages and disadvantages of separate legal status, including the fact that the corporate entity is no longer part of the State itself.

The corporate form, however, is not the only structure that signals the State has created a legally separate entity. Other aspects of state law may indicate legal separateness as well. Most obviously, the entity could be described as a "'separate legal entity.'" *Lake Country*, 440 U. S., at 401. State law also might define the entity as not part of the State for other purposes. See *Moor*, 411 U. S., at 719 (state law defined county as a "'local public entity'" instead of the "State" for purposes of suits against public entities). The ultimate question remains whether the State structured the entity as part of itself or as legally independent.

The Court's precedents also focus on whether the entity is liable for its own judgments or whether the State is formally liable, *i.e.*, whether "any judgment" against the entity "must be satisfied out of the state treasury." *Hess*, 513 U. S., at 51; *Planters' Bank*, 9 Wheat., at 907, see also *Regents*, 519 U. S., at 430. One of the central "underlying rationales for state sovereign immunity" is protecting States' "ability to make [their] own decisions about 'the allocation of scarce resources.'" *Lewis* v. *Clarke*, 581 U. S. 155, 167 (2017) (quoting *Alden*, 527 U. S., at 751). If the State is formally liable for judgments against an entity, that entity is more likely to be an arm of the State because its liabilities necessarily undermine the State's ability to make choices about how to allocate the State fisc.

In contrast to formal legal liability, an entity's practical financial relationship with the State, such as its expectation that the State would cover its judgments if needed, has less relevance. Just as a State cannot lose its sovereign immunity by "requir[ing] a third party to reimburse it" (such as by buying insurance), *Regents*, 519 U. S., at 431, a State cannot imbue an entity with its immunity simply by agreeing to "pick up the tab" (such as by choosing to indemnify the entity), *Lewis*, 581 U. S., at 165. Similarly, a State's history of subsidizing an entity carries little weight. State governments routinely fund nonprofits, private corporations, and municipalities, but the receipt of those state funds does not mean that those entities become part of the State itself, even when the funding is a "significant amount," *Mt. Healthy*, 429 U. S., at 280.

Finally, the Court's cases also suggest that courts may consider the degree of control the State exerts over the entity, but courts should do so with caution. Control is not especially probative because "ultimate control of every state-created entity resides with the State," even those that are not arms of the State. *Hess*, 513 U. S., at 47. Cities, counties, school boards, and state-created banks have all

been recognized as legally separate entities from the States, even though "the State may destroy or reshape any" of these entities that "it create[d]." *Ibid.* Further, "[g]auging actual control . . . can be a 'perilous inquiry'" and "'an uncertain and unreliable exercise.'" *Ibid.* (quoting Note, 92 Colum. L. Rev. 1243, 1284 (1992)). That is because the State might exercise control through various formal and informal levers, from appointing and removing officers, to directing projects or vetoing actions, to monitoring day-to-day operations, all of which are difficult to weigh against one another individually, let alone when assessing them in different combinations.

In fact, this Court has never once found a corporation that was liable for its own judgments to be an arm of the State, even when the State had significant control over the entity. That includes cases in which the State was the sole shareholder, possessed appointment and removal powers over the entity's officers, and "'manage[d]'" the entity's "'affairs.'" *Wister*, 2 Pet., at 323–324 (Bank of Commonwealth of Kentucky); see *Briscoe*, 36 U. S., at 344 (Story, J., dissenting) (describing Kentucky's appointment and removal powers over the Bank of Commonwealth of Kentucky). It also includes a case in which the State possessed appointment and removal powers over the entity's officers, veto power over its actions, and "determine[d] the projects [it] undert[ook]." *Hess*, 513 U. S., at 44–47.[5]

———————

[5] This discussion is not intended to exhaust all considerations that may be relevant to the arm-of-the-State analysis, and instead focuses on the considerations most pertinent to these cases. Additional considerations may apply, for example, in cases involving bistate entities or unincorporated entities. See *Hess,* 513 U. S., at 40 (describing that "[b]istate entities occupy a significantly different position in our federal system than do the States themselves"); *Auer* v. *Robbins*, 519 U. S. 452, 456, n. 1 (1997) (cursorily conducting analysis to conclude that an unincorporated Board of Police Commissioners, Mo. Rev. Stat. §§84.210, 84.030 (1994), was not an arm of Missouri).

C

Even if an entity is not an arm of the State, the Court has long recognized that a State's sovereign immunity may still require dismissal of the action if the State is the real party in interest in that particular case. Although the arm-of-the-State and the real-party-in-interest doctrines are related, they can provide separate bases for dismissal.

When a State is not named as a defendant in a lawsuit, it may still be the real party in interest. For instance, a damages claim against a state or federal officer in their official capacity is barred by sovereign immunity because "[t]he real party in interest is the government entity, not the named official." *Lewis*, 581 U. S., at 162; see *Edelman* v. *Jordan*, 415 U. S. 651, 663–665 (1974) (suit for retroactive damages against state official in his official capacity required dismissal because it ran against the state treasury). Similarly, a particular remedy may be barred by sovereign immunity if it runs directly against the State. See *Ayers*, 123 U. S., at 502–503 (injunction to compel a State's attorney general to perform contract required dismissal because it was "in substance, though not in form, a suit against the state"); *Governor of Georgia* v. *Madrazo*, 1 Pet. 110, 123–124 (1828) (equitable relief in suit against a Governor required dismissal because "the state itself may be considered as a party on the record"). In these instances, the case or remedy requires dismissal because the State is the real party in interest, not because the named defendant is an arm of the State.

This Court's decision in *Hopkins* v. *Clemson*, 221 U. S. 636 (1911), helps illustrate the difference between these two related paths of analysis. In *Hopkins*, a plaintiff sued a state college for building an embankment on the side of a river, which redirected the river's flow and "ruined" his downstream property. *Id.*, at 641–642. He sought both damages and an order to remove the embankment. The Court held that the damages claim could proceed because

the college was not an arm of the State, explaining that the college was instead a corporation that "might sue and be sued, plead and be impleaded, in its corporate name." *Id.*, at 646. Nevertheless, the Court explained that, because the State owned the title to the land on which the embankment sat, the State might be a "necessary party." *Id.*, at 648–649. If so, any order to remove the embankment would run directly against the State and would require the State's consent to be sued. *Ibid.* The Court therefore remanded for the lower court to determine whether the State was a necessary party and to "stri[ke]" that part of the suit if it was. *Id.*, at 649. In other words, the injunctive remedy would have required dismissal if the State were the real party in interest, but not because the college was an arm of the State.[6]

## III

### A

Under the principles articulated above, NJ Transit is not an arm of New Jersey.

To start, New Jersey structured NJ Transit as a legally separate entity. NJ Transit was created as a "body corporate and politic with corporate succession." N. J. Stat. §27:25–4(a). Consistent with that label, NJ Transit possesses typical corporate powers, such as the power to "[s]ue and be sued," "enter into contracts," and "[p]urchase, . . . or otherwise acquire, . . . real or personal property," among others. §§27:25–5(a), (j), (r). It also has the power to "[m]ake and alter bylaws," "[s]et and collect fares," raise funds from "gifts, grants, or loans," "[e]stablish" its own "operating divisions, "[a]dopt and maintain" its own "employee benefit programs," and even "[o]wn" and "control" any "corporate entity" that it "acquired" or "formed" to carry out its

---

[6] NJ Transit has never argued that New Jersey is the real party in interest in either of these two cases. These cases therefore do not implicate whether dismissal is required on this ground.

statutory objectives.  §§27:25–5(c), (g), (m), (n), (t), (u).  NJ Transit's corporate status serves as strong evidence that it is not an arm of the State.  See, *e.g.*, *Planters' Bank*, 9 Wheat., at 907–908; *Hess*, 513 U. S., at 44–46.

True, NJ Transit's organic statute also labels it an "instrumentality of the State."  §27:25–4(a).  The term "instrumentality," however, lacks the historical weight the corporate form does and says little about whether an entity is an arm of the State.  See, *e.g.*, *Regents*, 519 U. S., at 429 (asking "whether a state instrumentality may invoke the State's immunity," making clear that not all state instrumentalities are immune).  Moreover, other aspects of New Jersey law undercut any inference that the term "instrumentality" favors NJ Transit's position.  The New Jersey Tort Claims Act, for instance, excludes entities with sue-and-be-sued authority, like NJ Transit, from its definition of the "State." §§59:1–1, 59:1–3 (2026).  The New Jersey Contractual Liability Act also specifies that entities with sue-and-be-sued authority are not part of the State.  §59:13–2.  All told, NJ Transit is therefore structured as a legally separate entity under state law.

Second, the State is not formally liable for any of NJ Transit's debts or liabilities.  New Jersey law provides that "[n]o debt or liability of the corporation shall be deemed or construed to create or constitute a debt, liability, or a loan or pledge of the credit of the State."  §27:25–17.  Before this Court, NJ Transit concedes that "New Jersey is not formally liable for NJ Transit's debts."  Brief for NJ Transit 34.

Finally, the control that New Jersey exerts over NJ Transit does not change the overall conclusion here.  Undoubtedly, the State exerts a substantial amount of control over NJ Transit.  The Governor has appointment and removal powers over the Board, §27:25–4(b); a state cabinet member (the Commissioner of Transportation) chairs the Board, §27:25–4(d); the Governor may veto any of the

Board's actions, §27:25–4(f); and the Legislature may veto some eminent-domain actions, §27:25–13(h). On the other hand, New Jersey law states that NJ Transit "shall be independent of any supervision or control by the [transportation] department or by any body or officer thereof," and requires that it "exercise independent judgment." §§27:25–4(a), 27:25–4.1(b)(2)(d). In addition, the Governor's removal authority for 8 of the 13 board members is limited to for-cause removal. §27:25–4(b). This level of control does not meaningfully affect NJ Transit's status, given the fact that it is a legally separate corporation and is responsible for its own judgments.

## B

NJ Transit's and its *amici*'s counterarguments are unavailing. To start, NJ Transit contends that formal corporate status, which ordinarily includes a sue-and-be-sued power, is not dispositive in the arm-of-the-State analysis. True: As described above, the "corporation" label itself is not dispositive. See *supra*, at 10–11. NJ Transit, however, is a corporation that has all the hallmarks of separate legal personhood, such as the power to sue and be sued, make contracts, and hold property in its own name, which all indicate that it is not an arm of the State and does not share in its immunity from suit. This Court has not previously found a similarly structured corporation to be an arm of the State.

NJ Transit also contends that this Court's precedents have placed little weight on the formal aspects of corporate separateness, such as sue-and-be-sued clauses, citing *State Highway Comm'n of Wyo.* v. *Utah Constr. Co.*, 278 U. S. 194 (1929), for support. First, that case does not help its position. There, the Court held that a suit against the State Highway Commission of Wyoming had to be dismissed (for lack of diversity jurisdiction) because the contract at issue was between a construction company and the "State [of

Wyoming], acting through the highway commission," and thus the "real part[y] in interest" was the State itself. *Id.*, at 199–200. Given that the suit, "in effect, [wa]s against the State and must be so treated," it was "unnecessary for [the Court] to consider" other formal aspects of legal separateness like the Highway Commission's "grant of power to sue or be sued." *Id.*, at 199. The important fact was not that the commission was, in the abstract, an arm of the State; it was rather that this particular "suit" was against the State as the "real part[y] in interest." *Id.*, at 199–200. Second, and more importantly, many of this Court's cases throughout history have emphasized that the corporate form, which typically includes the power to sue and be sued, weighs strongly against arm-of-the-State status. See *supra*, at 6–10.[7]

Next, NJ Transit argues that New Jersey demonstrated its intent to create NJ Transit as an arm of the State by describing it as serving "public and essential governmental functions," §27:25–4(a), and delegating to it "substantial plenary public powers," such as the power to operate a

---

[7] NJ Transit also relies on several cases that did not squarely confront the arm-of-the-State inquiry. Two cases addressed whether, and to what extent, a "sue and be sued" clause waives sovereign immunity. See *Thacker* v. *TVA*, 587 U. S. 218, 221 (2019); *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U. S. 666, 676 (1999). Neither case addressed the relevance of the clause with respect to the arm-of-the-State inquiry, however, because the Court assumed in both cases that the entities at issue were entitled to sovereign immunity to begin with. *Thacker*, 587 U. S., at 221; *College Savings Bank*, 527 U. S., at 671, 676. Another two cases held that a plaintiff State could sue another State for actions taken by a state-created corporate agency at the defendant State's direction. See *Missouri* v. *Illinois*, 180 U. S. 208, 242 (1901); *New York* v. *New Jersey*, 256 U. S. 296, 302 (1921). Those cases did not address whether the corporate entities were arms of the State (such that every suit against them should be considered a suit against the State itself ), but rather held that the State was the proper defendant in those particular cases because the State directed the agency to conduct the activities over which the plaintiffs sued.

police force, exercise eminent domain power, and promulgate regulations, Brief for NJ Transit 22. The arm-of-the-State analysis, however, focuses not on whether the entity serves public functions, but rather on whether the State has chosen to serve those public functions through its own apparatus or through that of a legally separate entity. That is why the Court has long recognized that cities and counties are not arms of the State despite serving public functions and exercising police powers. See *Lincoln County*, 133 U. S., at 530–531 (municipal corporations); *Mt. Healthy*, 429 U. S., at 281 (school board). It is also why a "charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder[, b]ut none would conclude . . . that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' . . . immunity" as a result. *Hess*, 513 U. S., at 51.

Moreover, assessing what qualifies as an essential governmental function can be "unsound in principle and unworkable in practice." *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 546 (1985). It has the tendency to produce "inconsistent results" and hamper States' abilities to experiment by forcing them to "pay an added price when they meet the changing needs of their citizenry by taking up functions that an earlier day and a different society left in private hands." *Id.*, at 546–547. Here, for example, transportation services and infrastructure are "not readily classified as typically state or unquestionably local" given that "States and municipalities alike own and operate bridges, tunnels, ferries, marine terminals, airports, bus terminals, industrial parks, [and] also commuter railroads." *Hess*, 513 U. S., at 45. What is more, as shown by the history of NJ Transit itself, these services and functions used to be fulfilled primarily by private railroad and bus companies. See *supra*, at 3 (describing NJ Transit's acquisition of major private rail and bus companies). Instead

of deciding whether the operation of commuter rail and buses is a governmental function, the arm-of-the-State analysis concentrates on the fact that New Jersey chose to pursue those functions through the creation of a legally separate corporation.

NJ Transit also contends that the Court should consider not only formal liability, but also the practical reality of its financial relationship with the State. According to NJ Transit, this includes whether and to what degree the State funds the entity and whether the State is likely to voluntarily pay the entity's judgments. Brief for NJ Transit 34–37. In support of this position, NJ Transit relies on *Lake Country* and *Hess*. Neither case bears the weight NJ Transit places on it.

It is true, as *Lake Country* explained, that this Court has allowed entities to invoke sovereign immunity "in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself." 440 U. S., at 401. That statement, however, relied on cases concerning whether a State was the real party in interest in a particular lawsuit. *Ibid.*, and n. 18 (citing *Edelman*, 415 U. S. 651; and *Ford Motor Co.* v. *Department of Treasury of Ind.*, 323 U. S. 459 (1945)). As discussed above, that is a separate question from whether an entity is the arm of the State. See *supra*, at 14–15. On that question, *Lake Country*'s arm-of-the-State analysis discussed only whether the Compact "expressly provide[d] that obligations of [the entity] shall not be binding on either State." 440 U. S., at 402 (emphasis deleted).

Turning to *Hess*, that case framed the inquiry as asking whether the "State [was] in fact obligated to bear" the entity's judgments "both legally and practically," and mentioned that the entity had generated its own revenue for years. 513 U. S., at 45–46, 51. In answering that inquiry, the Court focused on whether "the compact or the laws of

either State" required them to do so, and the Court ultimately concluded that the States' lack of "legal liability for Port Authority debts" and formal "responsib[ility] for the payment of judgments" cut against arm-of-the-State status. *Id.*, at 46. *Hess*'s concentration on formal liability, rather than an overall evaluation of the entity's financial relationship with the State, is confirmed by this Court's other precedents as well. See, *e.g.*, *Planters' Bank*, 9 Wheat., at 907 ("judgment[s]" against state-created bank would "be satisfied by the property of the corporation, not by that of the individual corporators"); *Moor*, 411 U. S., at 719 (the "county alone" would be "liable for all judgments").[8]

Hinging an entity's arm-of-the-State status to the practical realities of state funding also risks arbitrary distinctions and inconsistent treatment of the same entity. These cases illustrate the problem: In the last 35 years, New Jersey's funding of NJ Transit's annual operating budget has oscillated anywhere from 15% to 46% of the budget. Brief for NJ Transit 35. Although NJ Transit maintains that it is and has always been an arm of New Jersey, it offers no meaningful way to decide how much funding is enough to prove it is "financially integrated with the State and financially dependent on it." *Id.*, at 34. The more apt question instead is whether the State would be formally obligated to pay the entity's judgments. See, *e.g.*, *Planters' Bank*, 9 Wheat., at 907; *Moor*, 411 U. S., at 719.

More generally, NJ Transit advocates for an arm-of-the-State inquiry that places more weight on the State's control

_____

[8] *Hess* also discussed two Circuit cases involving "transit facilities that place[d] heavy fiscal tolls on their founding States." 513 U. S., at 49–50. In those cases, even though the entities' originating statutes did not make the States liable for their judgments, the States operated the respective entities under distinctive federal statutory obligations not present here. See *Alaska Cargo Transp., Inc.* v. *Alaska R. Corp.*, 5 F. 3d 378, 381 (CA9 1993); *Morris* v. *WMATA*, 781 F. 2d 218, 225–227 (CADC 1986).

over, and practical financial relationship with, the entity. For support, NJ Transit points to a series of cases outside the sovereign immunity context. See *Biden* v. *Nebraska*, 600 U. S. 477 (2023) (standing); *Arkansas* v. *Texas*, 346 U. S. 368 (1953) (standing); *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374 (1995) (First Amendment); *Osborn* v. *Bank of United States,* 9 Wheat. 738 (1824) (intergovernmental tax immunity). As those very cases warned, however, an entity "can count as part of the State for some but not 'other purposes.'" *Nebraska*, 600 U. S., at 494, n. 3; see *Lebron*, 513 U. S., at 392, 400 (holding that Amtrak is "part of the Government for purposes of the First Amendment" but lacks the Government's "sovereign immunity"); see also *Priddy*, 295 U. S., at 235 ("Immunity of corporate government agencies from suit and judicial process . . . is less readily implied than immunity from taxation"). Accordingly, the analysis in those cases has little bearing on the arm-of-the-State analysis here.

Finally, 23 States contend as *amici curiae* that the current use of multifactor balancing tests in the lower courts has created significant uncertainty. To address this problem, they urge this Court to adopt a rule that a State's own characterization of an entity, such as New Jersey's labeling of NJ Transit as an "instrumentality of the State," should be dispositive.

One problem with the States' position is that it focuses on the label a State places on an entity, rather than assessing whether the State structured the entity as legally separate. See *supra*, at 12. Another problem is that the States' position prioritizes one of New Jersey's characterizations, the term "instrumentality," over another, "body corporate." There is no good reason to believe that the State intended for NJ Transit to be part of the State itself by using the word "instrumentality," when it simultaneously used the word "body corporate," a term traditionally understood to create a "[s]eparate legal personality." *First Nat. City*

*Bank*, 462 U. S., at 625; see *Moor*, 693 U. S., at 719–720 (holding that designation as "'body corporate'" showed lack of arm-of-the-State status even though state law deemed counties "'subdivisions of the State'"). The States' preferred test that any label a State chooses is dispositive therefore does not promote predictability in the treatment of state-created entities because it still requires courts to decide which state-law pronouncement is dispositive. Instead, what promotes consistency is adhering to a long line of cases in which this Court has found state-created corporations that are formally liable for their own judgments not to be arms of the States that created them.

Of course, all States maintain the power to "structure themselves as they wish." *Berger* v. *North Carolina State Conference of the NAACP*, 597 U. S. 179, 183 (2022). To the extent New Jersey, and other States, created such corporate entities intending that they would remain part of the State and that the State would formally assume their liabilities, the States are always free to amend their laws.

## IV

NJ Transit is not an arm of New Jersey and thus is not entitled to share in New Jersey's interstate sovereign immunity. The judgment of the New York Court of Appeals is affirmed, the judgment of the Pennsylvania Supreme Court is reversed, and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*